IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

CAROL FAY WILLIAMS,

      Plaintiff,

v.                                CASE NO. 2:10-cv-00777

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Claimant's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  Both parties have consented in writing to a decision by the United States Magistrate Judge.

Plaintiff, Carol Fay Williams (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on March 11, 2008, alleging disability as of January 1, 2005, due to bipolar disorder, depression, fibromyalgia, rheumatoid arthritis, high blood pressure, diabetes, blurry vision, hearing loss, and migraine headaches.  (Tr. at 10, 123-26, 129-35, 167-73, 212-18, 223-29.) The claims were denied initially and upon reconsideration.  (Tr. at 10, 71-75, 76-80, 84-86, 87-89.)  On February 4, 2009, Claimant requested a hearing before an Administrative Law Judge ("ALJ").

(Tr. at 10, 90.)  The hearing was held on October 27, 2009 before the Honorable John W. Rolph.  (Tr. at 30-66, 98, 104.)  By decision dated November 13, 2009, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 10-25.)  The ALJ's decision became the final decision of the Commissioner on April 14, 2010, when the Appeals Council denied Claimant's request for review.  (Tr. at 1-5.)  On May 28, 2010, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability.  See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims.  20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not disabled" at any step, further inquiry is unnecessary.  Id. §§ 404.1520(a), 416.920(a).  The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment.  Id. §§ 404.1520(b), 416.920(b).  If the claimant is

2

not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant

satisfied the first inquiry because she has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 12.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of fibromyalgia, morbid obesity, rheumatoid arthritis, chronic obstructive pulmonary disease [COPD], bipolar disorder NOS [not otherwise specified]/depression, general anxiety disorder, social phobia, borderline intellectual functioning, and personality disorder. (Tr. at 12-14.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 14-17.) The ALJ then found that Claimant has a residual functional capacity for sedentary work, reduced by nonexertional limitations. (Tr. at 18-23.) As a result, Claimant cannot return to her past relevant work. (Tr. at 23.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as systems surveillance monitor, router, and hand packer, which exist in significant numbers in the national economy. (Tr. at 23-24.) On this basis, benefits were denied. (Tr. at 24.)

Scope of Review

The sole issue before this court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as

"evidence which a reasoning mind would accept as sufficient to support a particular

4

conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is not supported by substantial evidence.

Claimant's Background

Claimant was 44 years old at the time of the administrative hearing. (Tr. at 34.) She has a ninth grade education. (Tr. at 34.) In the past, she worked as a restaurant cook, a fast food restaurant cashier, and a convenience store worker. (Tr. at 35, 44-49, 174, 54-55.) During her employment as a fast food restaurant worker, she was promoted to shift manager. (Tr. at 47, 49.) She also owned and operated a State certified child care business in her home. (Tr. at 44, 55.)

The Medical Record

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it further below.

Physical Evidence

Records indicate Claimant was a patient at Cabin Creek Health Center from October 31, 2002 to June 24, 2008.  (Tr. at 239-84.) Records indicate approximately twenty visits during this time period for a variety of medical issues including: obesity, nicotine addiction, pregnancy, sinusitis, generalized anxiety disorder/ bipolar disorder/severe depression, hypertension, degenerative disc disease of the lumbar spine, lumbosacral contusion, fibromyalgia, arthritis, chest, back, neck, shoulder, hip, head and tooth pain. Id.

On March 17, 2005, Claimant presented to the Charleston Area Medical Center ["CAMC"] Emergency Department with complaints of "some vaginal spotting" and stating that she is approximately eight weeks pregnant.  (Tr. at 328.) The attending physician, Penny S. Divita, D.O., noted no musculoskeletal complaints, vaginal discharge, nausea, vomiting, diarrhea, fever, chills or myalgias. Id.  Dr. Divita further noted that Claimant was positive for hypertension and tobacco use.  Id.

On April 7, 2008, Claimant presented to CAMC Emergency Department with complaints of lower back pain after she "fell on some steps earlier today."  (Tr. at 301.) Leon S. Kwoi, M.D.

6

diagnosed with "lumbosacral contusion" and prescribed Motrin 800 mg and Lortab 5 mg.  (Tr. at 302.)

On April 7, 2008, Frank A. Muto, M.D. reviewed Claimant's x-rays of Claimant's sacrum and coccyx and concluded: "Three views of the sacrum demonstrate no evidence of acute fracture or sacroiliac joint widening.  Impression: No evidence of acute sacral fracture." (Tr. at 315.)

On June 19, 2008, Claimant presented to CAMC Emergency Department with complaints of chest pain when she "coughs or takes a deep breath."  (Tr. at 309.) John A. Turley, M.D. noted that Claimant is a smoker and concluded in his initial assessment that Claimant had "[p]leuritic chest pain/bronchitis."  (Tr. at 310.) Following a chest x-ray, Dr. Turley prescribed Diclofenec 75 mg, Lortab 7.5 mg, an outpatient stress test and follow up with Cabin Creek Clinic.  (Tr. at 311.)

On June 19, 2008, Stephen M. Elksnis, M.D. reviewed Claimant's chest x-ray and concluded: "The heart is normal in size.  The lungs are clear.  Pulmonary vascularity is normal.  Impression: No evidence for acute cardiopulmonary disease."  (Tr. at 313.)

On August 13, 2008, Claimant presented to CAMC Emergency Department with complaints of a headache.  (Tr. at 305.) Christopher E. Carter, PA-C [Physician's Assistant-Certified] stated: "There is no indication for any diagnostic or medical imagining.  We gave her Reglan 10, Toradol 60 IM.  She has had some

improvement...follow up with Cabin Creek Clinic for...potential CT scan if her symptoms do not resolve." (Tr. at 306.)

On August 23, 2008, a State agency medical source completed a Disability Determination Evaluation of Claimant. (Tr. at 285-91.) The evaluator, Nilima Bhirud, M.D., determined:

> She has history of smoking one pack per day for 26 years...The claimant is 63-1/2 inches in height, weight 347...
>
> ASSESSMENT: The claimant is a 43-year old female who seems to have fibromyalgia and rheumatoid arthritis. She had swelling and tenderness of interphalangeal and metacarpophalangeal joints of both hands. She also had tenderness of both wrists and both shoulders. She had decreased range of motion of both ankles and both knees. Her blood pressure was very high.

(Tr. at 286, 288.)

On September 12, 2008, a State agency medical source completed a current evaluation of Claimant's Physical Residual Functional Capacity Assessment. (Tr. at 329-36.) The evaluator, A. Rafael Gomez, M.D., opined that Claimant's primary diagnosis is "Morbid obesity level III" and the secondary diagnosis, hypertension. (Tr. at 329.) He stated that Claimant had no established exertional, postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 330-34.) Dr. Gomez concluded: "Patient is not fully credible. Besides her morbid obesity level III and HTN [hypertension] there is no end-organ damage, complications or exertional limitations reported." (Tr. at 334.)

On September 12, 2008, Dr. Gomez also completed a Physical

Residual Functional Capacity Assessment for the period of Claimant's alleged onset date of January 1, 2005 to her date last insured of June 30, 2007. (Tr. at 337-45.) Dr. Gomez opined that Claimant had no established primary or secondary diagnosis for that time period. (Tr. at 337.) He concluded: "Insufficient evidence prior to DLI [date last insured] of 06/30/07 to assess this case." (Tr. at 344.)

On December 26, 2008, a State agency medical source completed a current evaluation of Claimant's Physical Residual Functional Capacity Assessment. (Tr. at 379-86.) The evaluator, Marcel G. Lambrechts, M.D., opined that there was "[i]nsufficient evidence prior to DLI [date last insured]" of 06/30/2007 to make an assessment. (Tr. at 379, 386.)

On December 26, 2008, Dr. Lambrechts completed a current evaluation of Claimant's Physical Residual Functional Capacity Assessment. (Tr. at 387-95.) He opined that Claimant's primary diagnosis is "Morbid obesity, BMI [body mass index], HBP [high blood pressure" and the secondary diagnosis, "Diabetes w. Blood sugar of 180." (Tr. at 387.) He opined that Claimant could occasionally lift and/or carry 50 pounds, frequently lift and/or carry 25 pounds, stand and/or walk and sit (with normal breaks) for a total of about 6 hours in an 8-hour day, and do unlimited push and/or pulling. (Tr. at 388.) Dr. Lambrechts found Claimant had no manipulative, visual, or communicative limitations. (Tr. at

9

390-91.) Her postural limitations were occasionally to be able to climb ramp/stairs, balance, stoop, and kneel but never to be able to climb ladder/rope/scaffolds, crouch or crawl. (Tr. at 389.) Her environmental limitations were unlimited save to avoid concentrated exposure to extreme cold and vibration, to avoid even moderate exposure to extreme heat, and to avoid all hazards. (Tr. at 391.) Dr. Lambrechts concluded: "This claimant is quite morbidly obese and has a BMI of 60.5. That is her main problem. She has HBP and a blood sugar of 180. She will be limited but still should be able to perform light to medium activities. RFC has been reduced." (Tr. at 392.)

Records indicate Claimant had ten clinic visits to Cabin Creek Health Systems from December 23, 2008 to July 23, 2009 with Donna M. Burton, FNP-BC [family nurse practitioner-board certified]. (Tr. at 429-61.) On November 7, 2008, her clinic visit was with Megan Olish-Terry, PA-C [physician's assistant-certified]. (Tr. at 454.) The July 23, 2009 clinical record indicates that Claimant had a "routine visit" with Ms. Burton:

> **Problem List**: Hypothyroidism NOS [not otherwise specified], Diabetes Mellitus, Migraine NOS, Benign Hypertension, Asthma, Bipolar Disorder, Generalized Anxiety Disorder, GERD, Domestic Abuse.
>
> **Current Meds**: Albuterol Sulfate 2.5 mg/3mL (0.083%) Neb Solution, Chantix 0.5 mg (11)-1 mg (3x14) Tabs in Dose Pack, Depakote ER 500 mg 24 hr Tab, Hydrochlorothiazide 25 mg Tab (Dosing: three at bedtime), Hydrocortisone 1% Ointment, Ibuprofen 600 mg Tab, Labetalol 300 mg Tab, Lisinopril-Hydrochlorothiazide 10 mg-12.5 mg Tab (Dosing: each day), Lortab 10/500 10 mg-500mg Tab, Metformin 500

10

mg Tab (Dosing: one twice a day), Neurontin 300 mg Cap
(Prior)(Dosing: one three times a day), Synthroid 50 mcg
Tab (Dosing: each day), Ultram 50 mg Tab (Dosing: every
8 hours), Vistaril 50 mg Cap (Dosing: three times a day),
Zanaflex 2 mg Cap (Dosing: two at bedtime), Zoloft 100 mg
Tab (Dosing: each day).

Subjective Complaints/HPI: Patient presents for routine
follow-up for hypertension.  There have been no interval
problems or new complaints.  Medications have not changed
and are listed on the medications list.  Blood sugar runs
160 at home - takes medications as directed.

Subjective Comment: Overall, the patient has felt well,
has been compliant with the prescribed medical regimen,
and has no new complaints.  Continues to have muscle and
low back pain.

(Tr. at 429.)

On January 21, 2009, Claimant had left shoulder and right knee

x-rays performed at CAMC.  (Tr. at 460-61.)  Regarding the left

shoulder, Christopher A. Schlarb, M.D., concluded: "Mild

degenerative changes, otherwise, I see no acute abnormalities."

(Tr. at 460.)  Regarding the right knee, Dr. Schlarb found: "No

acute fractures.  Degenerative changes are present." (Tr. at 461.)

Psychiatric Evidence

On August 13, 2008, a State agency medical source completed a

Psychological Evaluation of Claimant.  (Tr. at 292-96.)  The

evaluator, Lisa C. Tate, M.A., Licensed Psychologist, provided a

clinical interview and Mental Status Examination, wherein she

concluded:

MENTAL STATUS EXAMINATION: Orientation: Ms. Williams was
alert throughout the evaluation.  She was oriented to
person, place, time and date.  Mood: Observed mood was
depressed.  Affect: Affect was mildly restricted and she

11

did become tearful. <u>Thought Processes</u>: Thought processes appeared logical and coherent. <u>Thought Content</u>: There was no indication of delusions, obsessive thoughts or compulsive behaviors. <u>Perceptual</u>: She reports no unusual perceptual experiences. <u>Insight</u>: Insight was fair. <u>Judgment</u>: Judgment was within normal limits based on her response to the finding the letter question. She states, "Stick it in the mailbox." <u>Suicidal/Homicidal Ideation</u>: She denies suicidal or homicidal ideation. Immediate Memory: Immediate memory was within normal limits. She immediately recalled four of four items. Recent Memory: Recent memory was within normal limits. She recalled three of four items after 30 minutes. Remote Memory: Remote memory was within normal limits based on her ability to provide background information. Concentration: Concentration was moderately deficient based on the Digit Span score of 5. Psychomotor Behavior: Psychomotor behavior was normal.

<u>DIAGNOSTIC IMPRESSION</u>:

Axis I    296.23    Major depressive disorder, recurrent, with anxious features.

Axis II   V71.09    No diagnosis.

Axis III            By self-report, fibromyalgia, rheumatoid arthritis, migraine headaches, and hypertension.

<u>RATIONALE</u>: The diagnosis of major depression disorder, with anxious features is based on her report of feeling depressed most of the time for more than seven years. Identifying symptoms of depression include problems with concentration, frequent crying, nausea, loss of energy, loss of interest in activities, crying, feelings of hopelessness, feelings of worthlessness, and excessive irritability. It is believed that her irritability is related to both her depression and the reported presence of chronic pain.

<u>TYPICAL DAY</u>: On a typical day, Ms. Williams indicates she has no set sleep schedule. When asked to describe her daily activities, she states, "I get up and get some coffee, I get the baby something to eat, pick up after the baby." Her baby is reportedly 3 years old.

<u>DAILY ACTIVITIES</u>: Taking care of her 3-year-old baby,

cooking a light meal once a day, washing dishes once a day, and watching television.

WEEKLY ACTIVITIES: Taking a shower four times a week, and running the vacuum twice a week.

MONTHLY ACTIVITIES: Going to the grocery store three times a month, going to her sister's for coffee one to two times a month, going to K-Mart with sister once a month, and going to the doctor once a month.

HOBBIES and INTERESTS: Reported as holding the baby and watching television.

SOCIAL FUNCTIONING: Social functioning was within normal limits based on her interaction with staff during the evaluation.

CONCENTRATION: Concentration was moderately deficient based on the Digit Span subtest score.

PERSISTENCE: Persistence was within normal limits based on clinical observation.

PACE: Pace was within normal limits based on clinical observation.

CAPABILITY TO MANAGE BENEFITS: Ms. Williams appears competent to manage any benefits she may receive.

(Tr. at 294-96.)

On September 15, 2008, a State agency medical source completed a Psychiatric Review Technique form assessing Claimant from January 1, 2005, the alleged onset date, to June 30, 2007, the date last insured. (Tr. at 346-59.) The evaluator, John Todd, Ph.D., concluded: "Case cannot be adjudicated for given time frame due to INSUFFICIENT EVIDENCE." (Tr. at 358.)

On September 15, 2008, Dr. Todd also completed a "current" Psychiatric Review Technique. (Tr. at 360-73.) He stated

13

Claimant's affective disorder to be "MDD [major depressive disorder] recurrent w/ [with] anxious features." (Tr. at 363.) He found Claimant had a mild degree of limitation regarding restrictions of activities of daily living and in maintaining social functioning. (Tr. at 370.) He opined that Claimant had a moderate degree of limitation regarding maintaining concentration, persistence, or pace and had no episodes of decompensation, each of extended duration. <u>Id</u>. He concluded that the evidence did not establish the presence of the "C" criteria. (Tr. at 371.) He stated in his analysis:

> CLMT [Claimant] is credible w/ [with] OP [outpatient] psych [psychiatric] diag [diagnosis] and TX/meds [treatment/medications] from PCP [primary care provider]. Clmt received counseling w/ last OP visit on 4/14/08. MS [mental status] at CE [clinical evaluation] was WNL [within normal limits]/mild def [deficiencies] except for mod [moderate] def in concentration. Clmt filled out own ADL [activities of daily living] form and related performing personal and infant care, rides in car (never had DL [driver's license]), prepares meals, shops, manages finances, watches TV [television], talks on phone ("a lot"), visits w/ family. MRFC [mental residual functional capacity] REQUIRED.

(Tr. at 372.)

On September 15, 2008, Dr. Todd also completed a Mental Residual Functional Capacity Assessment form. (Tr. at 374-77.) He opined that Claimant not significantly limited in any of the eight activities concerning understanding and memory and social interaction. (Tr. at 374-75.) In the areas of sustained concentration/persistence and adaption, he concluded that she was

14

"not significantly limited" in nine activities but was "moderately limited" in the abilities to carry out detailed instructions, to maintain attention and concentration for extended periods, and to respond appropriately to changes in the work setting.  Id.  Dr. Todd concluded: "Clmt's functional capacity limitations do not exceed moderate and does not call for an RFC allowance.  The clmt has the above limitations otherwise able to perform worklike activities."  (Tr. at 376.)

On December 27, 2008, a State agency medical source completed a Psychiatric Review Technique form assessing Claimant from the time period prior to June 30, 2007, the date last insured.  (Tr. at 396-409.)  The evaluator, Debra Lilly, Ph.D., concluded: "Insufficient Evidence" and "no mer [medical evidence of record] for this time period."  (Tr. at 396, 408.)

On December 27, 2008, Dr. Lilly also completed a "current" Psychiatric Review Technique.  (Tr. at 410-23.)  She stated Claimant's affective disorder to be "bipolar" vs. "Major Depression."  (Tr. at 413.) She found Claimant had a mild degree of limitation regarding restrictions of activities of daily living and in maintaining social functioning.  (Tr. at 420.)  She opined that Claimant had a moderate degree of limitation regarding maintaining concentration, persistence, or pace and had no episodes of decompensation, each of extended duration.  Id.  She concluded that the evidence did not establish the presence of the "C" criteria.

15

(Tr. at 421.) Dr. Lilly stated in her analysis:

> The claimant is considered credible with regard to activities. These are not apparently limited from a mental disorder. She has friends with whom she interacts by telephone regularly, performs child care, follows instructions, etc. She had concentration problems at CE [clinical evaluation]. Tends to seek care for "pain" and admits to taking the pain pills of others. MRFC completed.

(Tr. at 422.)

On December 27, 2008, Dr. Lilly also completed a current Mental Residual Functional Capacity Assessment form. (Tr. at 424-28.) She opined that Claimant was not significantly limited in any of the twelve activities concerning understanding and memory, social interaction, and adaption, save "the ability to understand and remember detailed instructions" wherein she was found to be "moderately limited." (Tr. at 424-25.) In the area of sustained concentration and persistence, she concluded that Claimant was "not significantly limited" in six activities but was "moderately limited" in the abilities to carry out detailed instructions and to maintain attention and concentration for extended periods. (Tr. at 424.) Dr. Lilly concluded: "The claimant would have the above limitations. She retains the ability to learn, recall, and perform one and two step tasks." (Tr. at 426.)

On September 29, 2009, Mareda Reynolds, M.A., licensed psychologist, provided a psychological evaluation of Claimant for Claimant's representative. (Tr. at 462-73.) Ms. Reynolds found:

**MENTAL STATUS EXAMINATION**

16

Ms. Williams is a 44-year-old, Caucasian female who appears about her stated age. She is 5-feel, 6-inches tall and weighs 331 pounds. She has brown hair and brown eyes. She wears reading glasses and had those with her today. She was neatly and appropriately dressed. Grooming and hygiene were adequate on this occasion. Rapport was easily established and sufficient for the purpose of this assessment. She was cooperative and forthcoming with all information requested. Her social interaction during today's evaluation was appropriate. Eye contact was good. Length and depth of verbal responses were adequate, though there were some inconsistencies with reported dates. She spoke at a normal rate and volume and in complete sentences that were easily understandable. No impairment in communication was noted. She was alert and oriented. Objectively, mood was dysphoric. Affect was constricted, but appropriate to expressed ideas. She denied hallucinations, delusions, obsessions and compulsions. She did not appear to be responding to any internal stimuli. Speech was spontaneous, relevant, coherent and clear. There was no evidence of circumstantiality, flight of ideas, tangentiality, word salad or neologisms. Insight was fair. Judgment was fair. Ms. Williams denied homicidal and suicidal ideations at this time. Memory, concentration, and attention were mildly impaired. She is ambulatory with effective use of all extremities. Ms. Williams is predominantly right-handed. Persistence and pace were within normal limits based on clinical observation.

## PSYCHOLOGICAL TESTING
### Wechsler Adult Intelligence Scale (WAIS-IV)

| | | | |
|---|---|---|---|
| Verbal Comprehension: | 81 | Working Memory: | 83 |
| Perceptual Reasoning: | 94 | Processing Speed: | 79 |
| Full Scale IQ: | 81... | | |

The results of Ms. Williams' WAIS-IV are considered to be a valid indicator of her current intellectual functioning...Her Full Scale IQ score of 81 is in the borderline range of intellectual functioning.

### Wide Range Achievement Test - Revision 4 (WRAT4)

| | Standard Score | Grade Equivalent |
|---|---|---|
| Word Reading | 72 | 4.4 |
| Spelling | 72 | 4.3 |
| Math Computation | 74 | 4.5 |

The results of Ms. Williams' WRAT4 scores are considered to be valid. Effort and motivation are sufficient.

## SUMMARY and CONCLUSIONS
**DIAGNOSTIC IMPRESSIONS**

| | | |
|---|---|---|
| Axis I | 296.80 | Bipolar Disorder NOS |
| | 300.23 | Social Phobia |
| | 303.90 | Alcohol Dependence, in sustained full remission |
| | 301.9 | Personality Disorder NOS |
| Axis II | V62.89 | Borderline Intellectual Functioning |
| Axis III | By Report: | Fibromyalgia, Rheumatoid Arthritis, Diabetes, Migraines, Hypertension, Hypothyroidism, Bronchial Asthma |
| Axis IV | Family Conflict | |
| Axis V | GAF=50 | |

**SUMMARY/CONCLUSIONS**
Carol Williams is a 44-year-old, single, Caucasian female who resides with her sons in Belle, West Virginia. She has a ninth grade education and received special education services. She was last employed two years ago when she worked at Exxon. She quit due to increased medical problems. Ms. Williams came from a chaotic childhood characterized by physical, sexual, and emotional abuse, as well as substance abuse. She abused alcohol herself from the ages of 12 to 19. She was then involved in a verbally abusive marriage from age 17 until a year and a half ago. She presents with a history of chronic depression interrupted by brief periods of elevated mood, increased energy, and a reduced need for sleep. She has chronic feelings of emptiness, sadness, guilt, hopelessness, and helplessness. She also presents with low self-esteem and unstable sense of self. Dependent traits are noted, as well. Ms. Williams exhibits significant anxiety in social situations that occasionally manifest in the form of panic attacks. Her symptoms of depression and anxiety have continued to worsen over the course of several years, exacerbated by her medical problems. The mental status examination completed today indicated a dysphoric mood with constricted affect. Her memory, concentration, and attention were mildly impaired. The results of psychological testing indicated a Full Scale IQ score of 81, which is in the borderline range of intellectual functioning.

**PROGNOSIS**
Fair

**CAPABILITY**

18

      Ms. Williams should be able to manage any financial benefits she may be awarded.

(Tr. at 467-70.)

      On September 29, 2009, Ms. Reynolds also completed a form regarding Claimant's Mental RFC. (Tr. at 471-73.) She concluded that Claimant was moderately limited in all areas, save for being markedly limited in the ability "to maintain regular attendance and be punctual within customary tolerances" and "to complete a normal work day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. at 471-72.) Claimant was found to be slightly limited in the ability "to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness." (Tr. at 472.) She concluded with a statement that "substance use was not a factor in these ratings." (Tr. at 473.)

<u>Other Evidence</u>

      On November 20, 2008, the "Records Room" of Kanawha County Schools sent a letter to the West Virginia Department of Education and the Arts, Disability Determination Section, stating that Claimant is not in its database and that additional information would have to be submitted in order to complete a microfilm search. (Tr. at 378.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

      Claimant asserts that the Commissioner's decision is not

supported by substantial evidence because the ALJ erred in determining that the testimony of the vocational expert ["VE"] is consistent with the Dictionary of Occupational Titles ["DOT"] and erred in determining that Claimant is not disabled even though the VE did not identify any jobs that, as they are described in the DOT, fit within even the least restrictive hypothetical posed by the ALJ. (Pl.'s Br. at 1-4.)  Specifically, Claimant argues:

> The ALJ found that the claimant suffers form [sic, from] multiple severe exertional and nonexertional impairments. The ALJ found that the claimant is limited to sedentary work.  (Transcript at 19) With regard to nonexertional impairments, the Court found that he [sic, the] claimant can perform "simple and routine one and two step tasks." *Id*.  The VE agreed that such jobs are "R1" under the DOT. (Transcript at 61)...

> None of the jobs identified by the VE are "R1" one or two-step jobs, as the hypothetical proscribed.  If they are not R1, they are beyond the reasoning capabilities of the claimant...It is further noted that though router and cloth bander were identified as sedentary, these jobs are light under the DOT.  Further it is even more obvious that what was identified as a hand packer is actually a "cloth bolt bander." (Counsel recognizes the possibility that the VE was referring to 920.587-018 PACKAGER, HAND (any industry) alternate titles: hand packager. However, under the DOT, that job is...still beyond the Court's hypothetical limitations at medium exertional level and R2.)  Only surveillance system monitor is sedentary and that position is well beyond the claimant's capabilities with a R3 reasoning level.

> Hence, the VE identified only one sedentary job and under the DOT even that job does not fit within the claimant's nonexertional limitations.  All of the other jobs are outside of the sedentary exertional limitation set by the Court and beyond the simple one and two step "R1" limitation.  Hence the VE's testimony is demonstrably inconsistent with the DOT without any explanation for the discrepancy and therefore he did not identify any jobs that, as they are described in the DOT, fit within even

20

the least restrictive hypothetical posed by the Court.
(Pl.'s Br. at 2-4.)

The Commissioner responds that the ALJ's decision is supported by substantial evidence because the ALJ properly relied on the expert opinion testimony from the independent VE when determining Claimant was not disabled. (Def.'s Br. at 6-10.) Specifically, the Commissioner argues:

> Plaintiff asserts that all of the jobs identified by Mr. Tanzey are in conflict with the DOT because they exceed the "reasoning level" contemplated by the ALJ's finding limiting her to one- to and two-step tasks. (Pl.'s Br. at 1-4.) This assertion is false because it ignores testimony from Mr. Tanzey clarifying the requirements of the jobs he cited.
>
> The DOT lists the maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings. Social Security Ruling (SSR) 00-4p 2000 WL 1898704. Thus, reasoning level 3 jobs, in fact, subsume reasoning levels 1 and 2, and a job may well be generally performed at a lower reasoning level than the maximum level listed. In this case, Mr. Tanzey offered expert testimony that the jobs he listed are often performed at a lower reasoning level, consistent with the mental limitations assessed in Plaintiff's RFC (Tr. 60-62). When determining that Plaintiff could perform these jobs, the VE considered not only the information contained in the DOT and Plaintiff's RFC, but also the other factors relevant to Plaintiff's vocation profile, such as her educational level and work experience...Here, Mr. Tanzey, who reviewed the record and was aware of Plaintiff's educational level, past relevant work experience, and RFC, and the maximum reasoning levels required by the jobs in the DOT, testified that neither Plaintiff's intellectual ability nor her functional restrictions prevented her from performing work as a surveillance system monitor, router, or hand packager (Tr. 53-65)...
>
> Plaintiff's other assertion, that the router and hand packager jobs could not be performed by Plaintiff because

21

their exertional requirements exceed sedentary work activities is without merit (Pl.'s Br. at 1-4). While the DOT categorizes router and hand packager as being performed at the light and medium exertional levels, respectively, these exertional categories represent the maximum level of exertion required to perform these occupations as they are generally performed, not the exertional level required to perform this job in a specific setting. SSR 00-4p, 2000 WL 1898704. In any event, Mr. Tanzey explicitly testified that a significant number of router and hand packager jobs existed at the sedentary exertional level that Plaintiff could perform (Tr. 57-58; "router at sedentary" with 80,000 jobs nationally, and "certain sedentary hand packager jobs" with 212,000 jobs nationally).

Because Mr. Tanzey testified based upon his knowledge and experience after carefully considering Plaintiff's vocational profile, including her past work as a shift supervisor, and functional limitations, the ALJ reasonably relied upon his testimony to find that Plaintiff could perform the jobs Mr. Tanzey identified. Mr. Tanzey's testimony constituted substantial evidence that Plaintiff retained the ability to work as a surveillance system monitor, a sedentary router, or a sedentary hand packager notwithstanding her limitation to jobs involving only one- or two-step tasks. See 20 C.F.R. §§ 404.1566; 416.966(e)(stating that the services of a VE may be used in determining whether a claimant's work skills can be used in other work); SSR 00-4p 2000 WL 1898704 (stating that VE testimony can provide more specific information about jobs than the DOT, may include information not listed in the DOT, and may be based upon a VE's experience in job placement or career counseling)...The Commissioner submits that his decision that Plaintiff could perform a range of sedentary work, subject to certain nonexertional limitations, and thus was not disabled, is supported by substantial evidence.

(Def.'s Br. at 8-10.)

The ALJ wrote a substantial 16-page decision in which he considered the evidence of record, including the testimony of the VE, in determining whether a successful adjustment to other work could be made by Claimant.  The ALJ found:

If the claimant had the residual functional capacity to perform the full range of sedentary work, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.25. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled sedentary occupational base, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The VE testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as systems surveillance monitor (DOT 379.67-010) with 280,000 jobs in the nation and 10,000 jobs in the region; router (DOT 222.587.038) with 80,000 jobs in the nation and 5,000 jobs in the region; and hand packer (DOT 920.587-010) with 212,000 jobs in the nation and 7,000 jobs in the region. The VE, Mr. Tanzey, testified that the region includes West Virginia, Kentucky, and Ohio.

Additionally, the claimant's attorney asked the VE if the claimant's ability to perform the above occupations would be affected if the claimant could only occasionally use her hands. The VE testified that the claimant would not be able to perform the jobs noted above with this additional limitation. The undersigned has considered this additional limitation but finds that it is not supported by the record as a whole.

Pursuant to SSR 00-4p, the vocational testimony is consistent with the information contained in the DOT.

Based on the testimony of the VE, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. at 23-24.)

Claimant asserts that there was a conflict between the vocational expert's testimony about the systems surveillance

monitor, router, and hand packer jobs and the DOT definition.
Claimant states that the jobs in the DOT have a Specific Vocational
Preparation ("SVP")[1] rating and a General Education Development
Reasoning Level ("GED R")[2] rating of 2 and 3, rather than the "R1"
one or two-step jobs inquired about in the ALJ's hypothetical.
(Pl.'s Br. at 3.) Claimant further asserts that the DOT number
provided by the VT for the hand packer job, 920.587-010 is actually
the job of "cloth-bolt bander" and that the DOT number for hand
packer is 920.587-018.[3]   (Pl.'s Br. at 3-4.)   Claimant also
points out that neither job fits the ALJ's second hypothetical
because the cloth-bolt bander job is a light job and the hand
packer job is a medium exertional level job and both jobs are R2,
rather than R1.   Id.   Claimant further points out that only the
surveillance system monitor job is sedentary and it has a R3
reasoning level.   (Pl.'s Br. at 4.)

The vocational expert identified three representative jobs and
their DOT numbers at the administrative hearing in response to the

---

[1]   SVP "is defined as the amount of lapsed time required by a typical
worker to learn the techniques, acquire the information, and develop the
facility needed for average performance in a specific job-worker situation."
U.S. Department of Labor, Dictionary of Occupational Titles, Appendix C (4th
ed. 1991).

[2]   The DOT explains that the GED scale, which is comprised of six
levels, "embraces those aspects of education (formal and informal) which are
required of the worker for satisfactory job performance" and is composed of
three divisions, reasoning development, mathematical development and language
development.   Id.

[3]   The VE did misread the last number of the DOT number as "0" rather
than the correct "8".  However, his further testimony makes clear that "hand
packer" is the job he intended to reference.  (Tr. at 57-58, 62-63.)

ALJ's second hypothetical question (which increased limitations from light duty in the first hypothetical to more restrictive limitations for a sedentary exertional level with limitations), systems surveillance monitor (DOT 379.67-010) with 280,000 jobs in the nation and 10,000 jobs in the region; router (DOT 222.587.038) with 80,000 jobs in the nation and 5,000 jobs in the region; and hand packer (DOT 920.587-010) with 212,000 jobs in the nation and 7,000 jobs in the region. (Tr. at 57-58.) The ALJ did inquire about any conflict between the DOT and the vocational expert's testimony, and states in his decision that the vocational expert's testimony is consistent with the DOT. (Tr. at 59.)

During questioning by Claimant's representative, the VE testified that in his opinion, both reasoning level R1 and R2 jobs could be performed by someone limited to one and two-step tasks. (Tr. at 60.) The VE further testified that the reasoning requirements for surveillance system monitor listed in the DOT were out of date and too limiting. He testified that the job could be performed by someone with R1 reasoning level limitations. (Tr. at 61.) The VE then testified that in his opinion, router was a routine two step job that could be performed by someone with a R1 reasoning level because "it's very simple, very routinized." Id. The VE also testified that the hand packager job was a two-step job with "the lowest level of complexity of all the jobs." (Tr. at 62.) Upon further questioning, the VE testified that all the jobs

he discussed could be done by someone who could have no more than occasional contact with other people.  (Tr. at 62-64.)

Social Security Ruling ["SSR"] 00-4p clarifies SSA standards for the use of vocational experts ["VE"] who provide evidence at hearings before ALJs.  In particular, this ruling emphasizes that before relying on VE evidence to support a disability determination or decision, ALJ's must identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs and information in the DOT, including its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ["SCO"], published by the Department of Labor, and explain in the determination or decision how any conflict that has been identified was resolved. SSR 00-4p requires the ALJ to inquire of the vocational expert "about any possible conflict between [the vocational expert testimony] and information provided in the DOT" and resolve any conflicts.  SSR 00-4p, 2000 WL 1898704, *4 (Dec. 4, 2000).

In the subject case, the ALJ participated in the hearing wherein Claimant's representative questioned the VE regarding the conflicts between the occupational evidence provided by the VE and the information in the DOT and the VE explained the conflicts. (Tr. at 59-65.)  However, the ALJ did not "explain in the determination or decision how any conflict that has been identified was resolved" as required by SSR 00-4p.  Regarding this matter, the

26

ALJ wrote the following in his decision and failed to address how the VE's testimony conflicted with the DOT:

> To determine the extent to which these limitations erode the unskilled sedentary occupational base, the ALJ asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity.  The VE testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as systems surveillance monitor (DOT 379.67-010) with 280,000 jobs in the nation and 10,000 jobs in the region; router (DOT 222.587.038) with 80,000 jobs in the nation and 5,000 jobs in the region; and hand packer (DOT 920.587-010) with 212,000 jobs in the nation and 7,000 jobs in the region...

> Pursuant to SSR 00-4p, the vocational testimony is consistent with the information contained in the DOT.

> Based in the testimony of the vocational expert, the undersigned concludes that...the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

(Tr. at 24.)

> As pointed out by Claimant,

> None of the jobs identified by the VE are "R1" one or two step jobs, as the hypothetical proscribed...It is further noted that though router and cloth bander were identified as sedentary, these jobs are light under the DOT...(Counsel recognizes the possibility that the VE was referring to...hand packer.  However under the DOT, that job is...still beyond the Court's hypothetical limitations at medium exertional level and R2.)  Only surveillance system monitor job is sedentary and that position is well beyond the claimant's capabilities with a R3 reasoning level.

(Pl.'s Br. at 3-4.)

The VE testified that the limitations listed in the DOT for the security system monitor position were outdated, and that router

27

and hand packer would be R1 jobs. (Tr. at 61.)  As pointed out by the Commissioner, the VE is permitted through testimony to "include information not listed in the DOT, and may be based upon a VE's experience in job placement or career counseling." (Def.'s Br. at 10.)  However, per SSR 00-4p, the ALJ has an obligation to "explain in the determination or decision how any conflict that has been identified was resolved" and failed to do so.  The ALJ wrote that "the vocational testimony is consistent with the information contained in the DOT" when clearly the VE's testimony showed that it was not. (Tr. at 24, 59-65.)

After a careful consideration of the evidence of record, the court finds that the Commissioner's decision is not supported by substantial evidence.  Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings is granted, Defendant's Motion for Judgment on the Pleadings is denied, this matter is **REVERSED** and **REMANDED** for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g) and this matter is **DISMISSED** from the docket of this court.

The Clerk of this court is directed to transmit copies of this Order to all counsel of record.

ENTER: July 26, 2011

Mary E. Stanley
United States Magistrate Judge

28